**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 15 CV 23616 DPG**

**UNITED STATES OF AMERICA,**

   **Plaintiff,**

vs.

**$70,670.00 IN U.S. CURRENCY,**
**$101,629.59 IN U.S. CURRENCY**
**SEIZED FROM WELLS FARGO BANK**
**CASHIER'S CHECK NO. 6648201039,**
**AND $30,000.00 IN U.S. CURRENCY**
**SEIZED FROM CHASE BANK**
**CASHIER'S CHECK NO. 1178710368,**

   **Defendants *In Rem*.**
_____/

## CLAIMANTS' MOTION FOR SUMMARY JUDGMENT

  Claimants, Wilson Colorado ("COLORADO"), Kurvas Secret by W ("KURVAS"), and Miladis Salgado ("SALGADO"), by and through their undersigned counsel and pursuant to Federal Rule of Civil Procedure 56, hereby move for summary judgment because "… there is no genuine dispute as to any material fact and [Claimants are] entitled to judgment as a matter of law." Rule 56, Fed. R. Civ. Pro.

## RELEVANT FACTUAL BACKGROUND

1. AnnChery Fajas ("AnnChery") is the leading manufacturer and seller of high-quality luxury garments including, among other things, waist cinchers, hourglass body shapers, and power net body girdles.

2. It is a Colombian company with offices in several countries including Miami-Dade County, Florida.

1

3. Tatiana-Narvaez Caicedo ("NARVAEZ") was the general manager and person in charge of AnnChery's Miami-Dade County office, operations, and warehouse ("AnnChery Miami") located at 11231 NW 20 Street, Suite 130, Miami, Florida 33172. She was the general manager at AnnChery Miami for approximately six (6) years.

4. Shirley Ruiz ("RUIZ") was in charge of AnnChery customer service which included amongst other duties negotiating prices with customers, opening customer accounts, and thereafter managing said accounts. RUIZ was based out of AnnChery in Colombia where she was employed for over a decade.

5. The owners of AnnChery, Angelica Riveros ("RIVEROS") and Jerome Labourdet ("LABOURDET"), reside in Cali, Colombia, and entrusted AnnChery Miami to NARVAEZ who had been working for them in the Miami office for over eight (8) years.

6. NARVAEZ was responsible for the operation of AnnChery Miami and even given blank AnnChery checks signed by RIVEROS so that NARVAEZ could run and operate AnnChery Miami.

7. RIVEROS and LABOURDET would travel from Colombia to Miami to visit and check up on AnnChery Miami every two (2) to three (3) months.

8. Claimants COLORADO and KURVAS, Colorado's company, were clients of AnnChery that would purchase merchandise from AnnChery and resell it for a profit.

9. COLORADO was a close personal friend of NARVAEZ and throughout the years became acquainted with RIVEROS and LABOURDET.

10. In or around early April 2015, NARVAEZ decided to terminate Antonio Flores ("FLORES") who worked in the AnnChery Miami warehouse. NARVAEZ terminated Flores because he was stealing merchandise from the warehouse.

11. During those days, RIVEROS and LABOURDET travelled to Miami to check up on their business. At that time, FLORES, who had already been fired by NARVAEZ, informed them that NARVAEZ and COLORADO were stealing merchandise from AnnChery.

12. RIVEROS and LABOURDET then began to investigate FLORES' accusations against NARVAEZ and discovered that COLORADO and KURVAS had numerous handwritten invoices that were pending and had *not* been paid.

13. RIVEROS and LABOURDET confronted NARVAEZ and she admitted that COLORADO and KURVAS had numerous handwritten invoices that were pending because she had yet to formally invoice COLORADO and KURVAS through AnnChery's computer generated invoicing system.[1]

14. NARVAEZ said that she had more handwritten invoices for COLORADO and KURVAS at her apartment and went to retrieve them.

15. During their investigation, RIVEROS and LABOURDET located several blank money orders and cash in NARVAEZ's desk which was payment from customers that she had yet to deposit into AnnChery's bank account.

---

[1] It was common practice at AnnChery Miami to prepare handwritten orders for customers and thereafter enter the handwritten information into the AnnChery computer invoicing system and then present the computer generated invoice to customers for payment.

16. RIVEROS and LABOURDET decided to call the Sweetwater Police and reported that NARVAEZ and COLORADO were stealing merchandise from AnnChery.

17. The Sweetwater Police went to AnnChery Miami on April 20, 2015 to investigate the allegations against NARVAEZ and COLORADO.

18. Upon arrival, NARVAEZ explained that neither she nor COLORADO was stealing merchandise from AnnChery. She indicated that there were handwritten invoices that she had yet to prepare for COLORADO to pay. She explained that as soon as said invoices were formally prepared through AnnChery's computer generated billing system, COLORADO and KURVAS would pay them.

19. The Sweetwater Police instructed NARVAEZ to contact COLORADO so that he could go to Annchery Miami and pay the pending invoices.

20. Upon being contacted, COLORADO travelled to AnnChery Miami and met with RIVEROS, LABOURDET, and Sweetwater Police detectives to clarify that neither NARVAEZ nor he was stealing any merchandise, and to pay for any outstanding invoices.

21. COLORADO met with RIVEROS, LABOURDET, and the Sweetwater Police detectives for several hours to square away the pending invoices but NARVAEZ, who was most familiar with COLORADO's and KURVAS' account activity, was *not* permitted to participate in the meeting. In fact, she was arrested and taken to jail before RIVEROS and LABOURDET generated and presented the final AnnChery invoices for COLORADO to pay.

22. NARVAEZ was arrested by the Sweetwater Police and charged with scheming to defraud AnnChery of over $100,000.00. See attached Composite Exhibit A

4

(where Officer X. Hernandez reports the amount of the fraud reported by AnnChery owner Angelica Riveros at $125,000.00 and then Detective Brioso reported that Kurvas removed over $210,000.00 in merchandise without paying for it at the time of pickup).

23. During the meeting at AnnChery, the handwritten invoices that were pending were entered into AnnChery's computer generated billing system under the direction and supervision of RIVEROS and LABOURDET.

24. In total, RIVEROS and LABOURDET processed seventy-eight (78) handwritten invoices that were pending for COLORADO and KURVAS.

25. Thereafter, RIVEROS and LABOURDET presented COLORADO and KURVAS with formal AnnChery invoices for payment in the presence of the Sweetwater Police detectives.

26. At that time, COLORADO disputed the quantity of the invoices because the figures seemed too high and NARVAEZ was no longer there to confirm the amounts being billed.

27. Everyone however agreed that COLORADO would pay the formal computer generated AnnChery invoices prepared under the supervision and direction of LABOURDET and RIVEROS and that he would then go home to cross reference the payments with his records.

28. At that time, COLORADO issued four (4) checks to pay for the outstanding balance. Specifically, COLORADO issued the following checks:

   a) KURVAS Check No. 192 payable to AnnChery in the amount of $25,198.00;

   b) KURVAS Check No. 193 payable to AnnChery in the amount of $86,786.73;

5

c) KURVAS Check No. 194 payable to AnnChery in the amount of $26,220.00; and

d) KURVAS Check No. 195 payable to AnnChery in the amount of $83,554.00.

See attached Composite Exhibit B.

29. In total that day, COLORADO and KURVAS paid AnnChery a total of $221,758.73 to satisfy the outstanding balance that LABOURDET and RIVEROS calculated and said was due.

30. Upon issuing the four (4) checks, LABOURDET questioned whether KURVAS account had enough funds to cover the four (4) checks.

31. At that time, COLORADO opened up his bank accounts on line from an AnnChery computer so that LABOURDET could confirm with his own eyes that KURVAS and COLORADO had sufficient funds to cover the four (4) checks.

32. It was at that time that LABOURDET and RIVEROS saw and discovered that COLORADO and KURVAS had substantial additional funds in their accounts and despite having already been paid the invoices they had personally presented to COLORADO and KURVAS in the presence of the Sweetwater Detectives, LABOURDET and RIVEROS decided to pursue the rest of the funds in COLORADO and KURVAS accounts.

33. Thereafter, AnnChery deposited and cashed the four (4) checks in the total amount $221,758.73 paid by COLORADO and KURVAS.

34. The Sweetwater Police detectives did *not* arrest or charge COLORADO with any crime. In fact, COLORADO was subsequently listed as a State witness in the criminal case against NARVAEZ.

35. COLORADO then went to bail NARVAEZ out of jail.

36. Sometime thereafter COLORADO reviewed his records with NARVAEZ and confirmed that LABOURDET and RIVEROS had overbilled him by $6,436.90.

37. COLORADO then attempted to contact LABOURDET to notify him that he had been overbilled. LABOURDET however did not tend to COLORADO's calls and instead decided to hire Salazar Jackson, LLP, to get to the monies remaining in COLORADO's accounts.

38. On or about April 25, 2015, five (5) days after COLORADO and KURVAS paid the AnnChery invoices presented by LABOURDET and RIVEROS, COLORADO received a demand letter from AnnChery accusing him of being involved in a scheme to defraud AnnChery and civil theft. The demand letter notified COLORADO that a lawsuit was imminent and calculated AnnChery's losses of at least $250,000.00. See attached Exhibit C.

39. On April 27, 2015, after receiving AnnChery's demand letter, COLORADO went to his banks and withdrew the monies contained therein in the form of two (2) cashier's checks and during those days also withdrew cash. See attached Composite Exhibit D (asterisks denote when Colorado withdrew monies).

40. COLORADO took the money home and secured it.

41. On April 28, 2015, AnnChery filed a civil theft lawsuit in Miami-Dade Circuit Court against NARVAEZ, COLORADO, KURVAS, Wilmer Ocampo ("OCAMPO"), and Ocampo Investments accusing them of conspiring to steal from and defraud AnnChery. See <u>AnnChery Fajas USA, Inc. vs. Tatiana Narvaez et al.</u>, Case No. 2015-009539 CA 01.

42. In that lawsuit, AnnChery sought an emergency restraining order/injunction seeking to restrain (seize), amongst other items, the funds in COLORADO and KURVAS bank accounts.

43. Since COLORADO had already withdrawn the funds in his bank accounts, AnnChery failed to restrain and seize the monies that belong to COLORADO and KURVAS which constitute most of Defendant Properties.

44. Two (2) days later, on April 30, 2015, a confidential source ("CS") called DEA Special Agent Kimako Finey and reported that COLORADO was a narcotics trafficker that had approximately $450,000.00 in U.S. cash in stash houses in South Florida. The CS also informed SA Finey that NARVAEZ was a criminal associate of COLORADO and that she maintained a stash house for COLORADO. The CS provided SA Finey with the specific address to NARVAEZ'S home. See attached Exhibit E, DEA 6 prepared by Agent Finey on May 18, 2015.

45. The CS did *not* make any allegation that COLORADO was a thief or fraudster who had defrauded AnnChery.

46. On May 11, 2015, several law enforcement officers with canines appeared at NARVAEZ'S home without a warrant, searched it, and, contrary to the CS's allegations, discovered *no* contraband. At that time, NARVAEZ provided law enforcement with COLORADO's home address. See attached Exhibit F, DEA 6 prepared by agent Finey on 5/11/2015 page 2 π 6.

47. Later that day, law enforcement appeared at COLORADO's home, illegally searched it, and seized Defendant Properties.[2] Law enforcement also emphasized that they located suspected marijuana residue, two (2) or three (3) baggies of suspected cocaine, a kilogram press, and a bong within the home. See attached Exhibit F, DEA 6 prepared by agent Finey on 5/11/2015.

48. At the time of the seizure, COLORADO offered to show SA Finey all the business and banking records that documented the legitimate source of Defendant Properties. However, unlike the Sweetwater Police detectives, SA Finey declined to review any of COLORADO's business or banking records.

49. On June 9, 2015, NARVAEZ was formally charged by the State Attorney's Office for Miami-Dade County with organized scheme to defraud AnnChery of fifty thousand dollars ($50,000.00) or more. According to the Information the alleged scheme occurred between April 10, 2015 and April 17, 2015; a seven (7) day period.[3] See attached Exhibit G (original NARVAEZ Information).

50. COLORADO was listed by the State of Florida as a witness against NARVAEZ. See State of Florida vs. Tatiana Alejandra Narvaez-Caicedo, Case No. F15-008253.

---

[2] COLORADO has also reported to the government that an additional $42,000.00 in U.S. Currency disappeared during law enforcement's search of his home. The $42,000.00 in U.S. Currency is unaccounted for and it does *not* seem like law enforcement is investigating its whereabouts.

[3] Note that the alleged seven (7) day theft period, April 10, 2015 through April 17, 2015, in the State's Information is significantly shorter than what Annchery owner Angelica Riveros had previously reported to Sweetwater Detective Brioso on April 20, 2015 when she stated that the theft period was over two (2) months long. It also differs from what Mrs. Riveros told Sweetwater police officer X. Hernandez when she told him that the thefts had started in early April 2015; therefore a three (3) week long theft period.

51. NARVAEZ's criminal case was assigned to Assistant State Attorney William Kostrzewski, Esq., who began to investigate the allegations.

52. On or about June 17 through 18, 2015, the DEA sent COLORADO and SALGADO personal notices of seizure informing them that the $70,670.00 in U.S. Currency and two (2) cashier's checks that had been seized from their home were seized by the DEA *solely* "… for forfeiture pursuant to Title 21 United States Code (U.S.C.) Section 881, *because the property was used or acquired as a result of a violation of the Controlled Substances Act (Title 21 U.S.C. Sections 801 et seq.).*" See attached Exhibit H, DEA notices of seizure.

53. Over three (3) months later, on September 28, 2015, the government filed a verified complaint against Defendant Properties alleging that they derive from COLORADO's criminal activities which include narcotics trafficking, money laundering, and thievery from AnnChery "*from in or about October 2014 to at least May 2015*." See ECF No. 1 π 6.[4]

54. On December 15, 2015, after months of investigation and actually interviewing NARVAEZ, Mr. Kostrzewski decided to *nolle prosse* the organized scheme to defraud in the first degree (over $50,000.00) charge against her and amended the charge to organized scheme to defraud in the third degree (less than $20,000.00). Again, the subsequent Information alleged that the theft period at

---

[4]Significantly, the government seized Defendant Properties on May 11, 2015, as solely deriving from narcotics trafficking. See Exhibit H, DEA notices of seizure. Thereafter, after failing to find any evidence linking COLORADO and/or NARVAEZ to narcotics trafficking, the government learned of the pending civil commercial dispute in Miami-Dade Circuit Court between AnnChery, NARVAEZ, COLORADO, KURVAS, Wilmer Ocampo, and Ocampo Investments Corporation and decided to add a money laundering and a dealing in stolen property allegation under 18 U.S.C. § 2314 in the verified forfeiture complaint filed in this case.

AnnChery was from April 10, 2015 through April 17, 2015 See attached Composite Exhibit I (Narvaez subsequent Information).

55. That same day, NARVAEZ was referred to a pre-trial diversion program to dispose of her criminal case without any finding of guilt.

56. Thereafter, on February 8, 2016, in a good faith effort to demonstrate the legitimate source of Defendant Properties, COLORADO, through counsel, provided the government with all the business and banking records that prove that Defendant Properties derive from COLORADO's legitimate business in the body shaping garments and accessories industry.

57. Said business and banking documents were produced voluntarily, in good faith, and *before* formal discovery in hopes that the government would review them and realize that Defendant Properties do *not* derive from the illegal activities alleged.

58. On January 3, 2017, the State of Florida *nolle prossed* and dropped the criminal case against NARVAEZ with no finding of guilt. See attached Exhibit J (Certified Dispositions of NARVAEZ's organized fraud charges).

59. On December 15, 2015, NARVAEZ settled the State civil lawsuit filed by AnnChery by agreeing to a Consent Final Judgment against her and in favor of AnnChery in the amount of $350,000.00 plus interest at the prevailing legal rate of interest. See attached Composite Exhibit K.

60. On November 18, 2016, the State Civil Court entered an Order (I) holding Defendants Wilson Colorado and Kurvas Secret by W, Inc., in Contempt of Court; and (II) awarding Sanctions for Concealment and Spoliation of Evidence.

In the Order, the State Court entered judgment in favor of Plaintiff [Annchery] against Defendants COLORADO and KURVAS on all counts of the Second Amended Complaint as a sanction since the facts of the case were never adjudicated. See attached Composite Exhibit L.

61. Claimants COLORADO and KURVAS were unable to properly defend the State civil case and therefore comply with that Court's discovery orders which resulted with the ultimate sanction of having their answers and defenses stricken because they did not have the financial means to defend that litigation.

62. Claimants COLORADO and KURVAS did not have the financial means to defend the State civil case because on May 11, 2015, law enforcement agents entered COLORADO's home illegally without a search warrant and seized Defendant Properties which constituted all of COLORADO's working capital and lifetime savings.

63. Without access to Defendant Properties, COLORADO and KURVAS could not continue to operate their garment and accessories business or properly defend the State civil court lawsuit filed by Annchery against them.

64. The government's seizure and attempted forfeiture of Defendant Properties has caused significant and devastating financial, economic, social, reputational, and mental damages to all of the Claimants in the case *sub judice*.

## MEMORANDUM

## CLAIMANTS COLORADO AND KURVAS

This Court should enter summary judgment in favor of Claimants COLORADO and KURVAS because there is no genuine issue of material fact and they are entitled to judgment as a matter of law.

Indeed, despite nearly two (2) years of investigations, the government has *no* evidence to prove that the monies that COLORADO and KURVAS are claiming derive from cocaine trafficking. This is an undisputed material fact because at deposition Jose Mantilla, who is the current lead DEA agent on this case, testified as follows:

> **Q.    Do you have – have you identified any transaction, drug transaction, that generated the $55,000, the $55,000 that was recovered in this case?**
>
> **A.    No.**
>
> **Q.    How about the two cashier's checks. Have you identified any drug transaction where those – that generated those two cashier's checks?**
>
> **A.    No.**
>
> **Q.    Have you identified or associated Wilson Colorado with any Mexican cartel?**
>
> **A.    No.**
>
> **Q.    Have you found any evidence showing that Wilson Colorado moved $450,000 from drug proceeds from Spain to Miami?**
>
> **A.    No.**
>
> **Q.    Have you located any additional stash houses, in the South Florida area, where Wilson Colorado is said to store bulk cash or cocaine?**
>
> **A.    No.**

> Q. Drug money?
>
> A. No.
>
> Q. Have you identified any stash house location where Wilson Colorado is said to maintain bulk cash or drugs, in the South Florida area?
>
> A. No.
>
> **See attached Exhibit M, Mantilla deposition pages 76-77.**

Likewise, after nearly two (2) years of investigations, the government has *no evidence* that the monies COLORADO and KURVAS are claiming derive from money laundering activities. Specifically, agent Mantilla testified as follows:

> Q. Have you identified any money laundering transaction where the seized cash was involved in?
>
> A. No.
>
> Q. How about money laundering transaction where the two cashier's checks were involved in, or derived from?
>
> A. No.
>
> Q. No money laundering transaction that you can identify these cashier's checks from?
>
> A. I have not.
>
> **See attached Exhibit M, Mantilla deposition page 77.**

Agent Mantilla also admitted that there is *no* evidence that COLORADO is a money launderer who was laundering $450,000.00 dollars for a Mexican drug Cartel as was initially alleged by the confidential informant triggering this whole investigation and subsequent forfeiture lawsuit. He testified as follows:

> Q: Any evidence that Wilson Colorado is a money launderer for the Mexican cartel?

> A:     No.

**See attached Exhibit M, Mantilla deposition page 90.**

Finally, there is *no evidence* that COLORADO stole or defrauded AnnChery out of any merchandise which he subsequently resold through KURVAS. Again, at deposition, agent Mantilla testified as follows:

> Q.    Have you identified any merchandise stolen by Claimant Colorado or Kurvas Secret by W, from AnnChery, like any merchandise that he stole from there?
>
> A.    I'm sorry?
>
> Q.    Identified or located?
>
> A.    I haven't.
>
> Q.    Have you identified any merchandise that Claimant Colorado and Kurvas Secret by W obtained through theft, from AnnChery?
>
> A.    No.
>
> Q.    Have you identified any merchandise that they obtained through fraud from AnnChery?
>
> A.    I have not identified.

**See attached Exhibit M, Mantilla deposition page 77.**

Later in the deposition, agent Mantilla reiterated and admitted that he had *no* evidence to support the dealing in stolen property allegation in the government's verified forfeiture complaint. Specifically, agent Mantilla testified as follows:

> Q:    Any evidence that Wilson Colorado is a thief that stole merchandise from AnnCherry?
>
> A:    If I have any evidence – I don't have any evidence that he stole anything.

15

> Q: Do you have any evidence that Wilson Colorado defrauded AnnChery, in any way?
>
> A: I don't have any evidence.
>
> Q: Do you have any evidence that, that money does not derive from the sale of merchandise through Kurvas Secret by W, evidence that, that money does not come from what he says it comes from, which is the sale of merchandise through Kurvas Secret?
>
> A: No.

**See attached Exhibit M, Mantilla deposition pages 90-92.**

## COLORADO AND KURVAS CLAIMS

Significantly, the sworn un-rebutted record evidence proves that COLORADO and KURVAS: 1) went to AnnChery on April 20, 2015; 2) met with AnnChery owners, LABOURDET and RIVEROS, and Sweetwater Police detectives for several hours; 3) they all reviewed KURVAS' account history and pending invoices; and 4) paid the computer generated AnnChery invoices that were prepared and presented to COLORADO by LABOURDET and RIVEROS. In fact, KURVAS overpaid the outstanding invoices by $6,436.90 since it owed $215,321.83 as opposed to the $221,758.73 that was billed by LABOURDET and RIVEROS. See attached Exhibits N (Sworn Affidavit of COLORADO) and Exhibit O (Sworn Affidavit of NARVAEZ).

## CLAIMANT MILADIS SALGADO

The government's case against the $15,070.00 in U.S. Currency recovered from SALGADO's closet and being claimed by SALGADO is even weaker and completely meritless. In fact, there is absolutely *no* evidence connecting the $15,070.00 to cocaine trafficking, money laundering, or dealing in merchandise stolen or obtained by fraud from AnnChery. This is evident for several undisputable facts.

16

First and foremost, the rank, unsworn, and biased hearsay allegations of the confidential informant that have already been discredited and disproven with regards to the origin and intended use of COLORADO's Defendant Properties[5], did *not* include that SALGADO was involved in cocaine trafficking and/or money laundering with COLORADO.

Second, the confidential informant *did not* identify or accuse SALGADO of being a person that stashed bulk cash for COLORADO as he/she accused NARVAEZ of doing. And, with regards to the dealing in stolen merchandise count, neither AnnChery nor the government has alleged at any time that SALGADO stole or obtained merchandise through fraud from AnnChery.

Third, the two (2) baggies of cocaine allegedly found in SALGADO's home were claimed by her son Andres who indicated that they were for personal use. The alleged amount of cocaine within said baggies was so *minuscule* that the State of Florida *did not* even formally charge Andres with possession of a controlled substance or any other crime. See attached Exhibit P (Certified Disposition in State of Florida vs. Andres Colorado, Case No. F15 – 009793).

Fourth, there is absolutely *no* evidence that the marijuana bong that was apparently discovered in SALGADO's minor daughter's room belonged to SALGADO or

---

[5]This case started on April 30, 2015 when a confidential informant called lead DEA agent Kimako Finey and reported that COLORADO was a multi-kilogram cocaine trafficker based out of Spain and that he had $450,000.00 in U.S. cash in South Florida that derived from his cocaine trafficking in Spain and that he was laundering it for a Mexican cartel. The confidential informant who is perhaps associated with AnnChery told agent Finey that COLORADO had the cash in different South Florida stash houses and that NARVAEZ was an accomplice that stored bulk cash in her home for COLORADO.

that SALGADO used said bong to traffic in multi-kilograms of cocaine or launder drug money.

## SALGADO'S CLAIM

The un-rebutted sworn evidence contained in the record proves that SALGADO is a hardworking mother of two (2) who has been gainfully employed at Duty Free America ("Duty Free") for many years. She works at the Duty Free located at Miami International Airport ("MIA") and has undergone extensive background checks and obtained clearances to be able to work at MIA. In fact, Ms. SALGADO is such a hard working individual that after her $15,070.00 was seized by the government, she decided to obtain a second job at Subway making sandwiches.

Despite the complete lack of evidence connecting SALGADO's $15,070.00 to the allegations in the government's verified complaint, incredibly, the government continues to attack her by turning her life inside out and upside down all in an attempt to keep the $15,070.00. SALGADO has expended a substantial amount of time, energy, and money defending this case, obtaining years of bank statements, and other documents to satisfy the government that her $15,070.00 are lawful yet the government is deaf to SALGADO's plight and continues on its quest to keep SALGADO's $15,070.00.

TRULY INCREDIBLE!!!

## CONCLUSION

In conclusion, there are no genuine issues of material fact and Claimants are entitled to judgment as a matter of law. It is time for the government to gather and bring in its' fishing nets, return the monies taken from Claimants' home, and move on to the next unfortunate soul that happens to have a substantial amount of cash at home which

some confidential informant learns about and then reports it to his DEA handler in an attempt to make a percentage of the money if successfully forfeited.

                                      Respectfully submitted,

                                      By: */S/Juan D. Berrio*
                                          Juan D. Berrio, Esq.
                                          FL Bar No. 0236070

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed with the Clerk of Court via ECF filing this 27th day of March, 2017.

                                      Respectfully submitted,

                                      By: */S/Juan D. Berrio*
                                      Juan D. Berrio, Esq.
                                      FL Bar No. 0236070

                                      BERRIO & BERRIO, P.A.
                                      2333 Brickell Avenue, Suite A-1
                                      Miami, FL 33129
                                      Telephone (305)358-0940
                                      Facsimile (305)359-9844
                                      Email: jdberrio@hotmail.com